# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Indemnity Insurance Company of :
North America and Sedgwick Claims :
Management Services, Inc., :
               Petitioners :
                        :
                        : No.  1767 C.D. 2019
           v.               :
                        : Submitted:  September 15, 2020
Bureau of Workers' Compensation, :
Fee Review Hearing Office :
(Lehigh Valley Hospital), :
               Respondent :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ELLEN CEISLER, Judge

## *OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                     FILED:  October 16, 2020

Indemnity Insurance Company of North America and Sedgwick Claims Management Services, Inc. (collectively, Insurer) petition for review from the December 11, 2019 final determination of a hearing officer (Hearing Officer) of the Bureau of Workers' Compensation Fee Review Hearing Office (Bureau), which vacated an administrative decision by the Bureau and concluded that Lehigh Valley Hospital (Provider) was entitled to $50,239.57, less the $5,135.97 Insurer previously paid, plus statutory interest, under the trauma center exemption for medical services provided to Thomas Woolever (Claimant).  In vacating the Bureau's fee review determination, the Hearing Officer found that Claimant suffered an immediately life-

threatening or urgent injury and, therefore, Insurer was obligated to reimburse Provider the full amount of its usual and customary charges as opposed to a lesser amount as delineated in the statutory provisions that cap reimbursement rates and payments for medical services.

## Facts and Procedural History

The relevant facts and procedural history, as found by the Hearing Officer and based predominately on Claimant's medical records, are as follows. On February 5, 2019, Claimant, who was 58 years old at the time, was injured while working for Nestle USA, Inc. (Employer) when his right arm became stuck in a conveyor belt. Emergency Medical Services (EMS) transported Claimant by ambulance to Provider's emergency department (ER) as a trauma alert due to the crush injury and he arrived at 12:41 p.m. EMS reported that Claimant had lost approximately 50-100 milliliters of blood at the scene and that Claimant had a "dusky hand." EMS therefore put Claimant in a splint and administered 100 mcg of Fentanyl in route to Provider. Upon arrival at the ER, Claimant reported that he immediately felt pain in his right arm after it became stuck in the conveyor belt and numbness and mild pain in his right fourth finger. The attending physician, Dr. Rovinder Sandhu, M.D. (Dr. Sandhu), noted that Claimant's forearm was deformed and that he had lacerations to both his forearm and hand. Claimant was admitted to the trauma center at 1:24 p.m. (Finding of Facts (F.F.) Nos. 1-4.)

After Claimant's admission, Dr. Haley Phillips, D.O. (Dr. Phillips) performed a physical examination of Claimant at 1:24 p.m. Claimant's temperature was 97.8 degrees Fahrenheit; his blood pressure was 161/80; his heart rate was 65; his respiratory rate was 16; and his Glasgow Coma Scale score was 15. Dr. Phillips

2

noted that Claimant's right forearm was crushed inwards into his wrist and his right hand was swollen between his first and second digits. Claimant experienced, among other things, decreased sensation over his fourth distal finger, and he had multiple skin tears on his anterior and posterior forearm and anterior hand. An x-ray revealed that there was abnormal subcutaneous air along his right wrist, but no fracture dislocation. Dr. Phillips ordered hourly neurovascular checks with vitals, due to Claimant being at a high risk of developing compartment syndrome (*i.e.*, pressure build-up), and later diagnosed Claimant with a "crush injury" to the right arm. (F.F. Nos. 5-6.) Dr. Sandhu later signed an attestation agreeing with Dr. Phillips' medical findings and treatment plan. (F.F. No. 6 n.2.)

Claimant was then admitted to the trauma/neuro intensive care unit at 3:19 p.m. Shortly thereafter, Samantha Rabenold, R.N. (Nurse Rabenold), noted that Claimant had diminished strength in his right upper extremity, minimal numbness at the tip of the right ring finger, and all of his pulses were palpable. She applied dressing to Claimant's abrasions and skin tears on his forearm. (F.F. Nos. 7-8.) Next, Claimant underwent a plastic, reconstructive, and hand surgery consultation with Dr. Nathan Miller, M.D. (Dr. Miller), of the plastic surgery department at 4:32 p.m. Dr. Miller made a number of observations, (F.F. Nos. 9.a.-c.), and diagnosed Claimant with a right forearm crush injury with superficial skin abrasions. (F.F. No. 9.d.) According to the medical charts, at 4:56 p.m., Nurse Rabenold indicated that frequent neurovascular checks would continue as part of Claimant's treatment plan. (F.F. No. 10.)

The following morning, on February 6, 2019, at 6:09 a.m., Dr. Phillips reexamined Claimant and observed the following: Claimant had undergone hourly neurovascular checks overnight; it was unlikely that he would develop compartment

3

syndrome; the numbness on the tip of Claimant's fourth digit was minimal; Claimant's lower right arm was dressed with gauze; and the dorsal and volar compartments of the forearm were soft and there were skin tears and abrasions. In addition, Dr. Phillips documented that Claimant's radial pulses were 2+; his right hand had normal sensation and 4/5 grip strength; and his pain was controlled with Fentanyl and Morphine and he was to start on oral pain medications. Dr. Phillips also noted that Dr. Miller had recommended local wound care, sterile dressing, and a follow-up at the plastic surgery department. Dr. Phillips opined that Claimant could be discharged to home. (F.F. No. 11.a.-e.)

Claimant was reexamined by Dr. Miller at 6:23 a.m. Claimant reported his pain was not any worse and there was no increasing numbness or tingling in his forearm or hand. Dr. Miller found that Claimant's condition was unchanged since the day before and, although there was persistent swelling, Claimant displayed a full range of motion of his fingers and wrist. Dr. Miller noted that surgical intervention was not necessary and recommended that Claimant follow-up with Claimant's doctor after his discharge. (F.F. No. 12.a.-c.)

At 8:00 a.m., Claimant was examined again, this time by Susan McCauley, R.N. (Nurse McCauley), who observed that Claimant could self-reposition, was able to wiggle his fingers, was somewhat edematous (swollen), and denied sensations of pain and tingling. (F.F. No. 13.) Ultimately, Claimant was discharged at 2:42 p.m., on February 6, 2019, in good condition and was prescribed Tramadol for pain and triple antibiotic ointment for lacerations, and was further advised to follow-up with plastic surgery in two weeks. In the paperwork documenting Claimant's discharge diagnosis, it was noted that Claimant was admitted to the trauma center the day before in stable condition; his creatine

4

phosphokinase (CPK) was within normal limits; Claimant remained intact on a neurovascular level; and his pain was controlled during his admission. (F.F. No. 14.a.-c.)

On February 19, 2019, Provider billed Insurer $50,239.57 for the treatment and services provided to Claimant on February 5 and 6. The bill indicated that acute care had been provided to Claimant for an urgent or life-threatening injury and that Provider is an accredited trauma center. (F.F. No. 15.) On April 8, 2019, Provider filed a timely application for fee review with the Bureau, pursuant to section 306(f.1) of the Workers' Compensation Act (WC Act),[1] 77 P.S. §531, for the dates of service of February 5 and 6, 2019, contesting the amount of payment and the timeliness of payment. (F.F. No. 16.a.-b.)

On May 8, 2019, the Bureau circulated an administrative determination, in which it concluded that $5,135.97 was due to Provider for the treatment and services rendered to Claimant on the above dates, plus interest at the rate of 10% per annum, to be calculated from the date on which payment was due. The Bureau also determined that the services rendered to Claimant did not meet the criteria of the trauma guidelines as defined in section 127.128 of the Workers' Compensation Medical Cost Containment Regulations, 34 Pa. Code §127.128.[2] Consequently, the

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§1-1041.1, 2501-2710.

[2] Section 127.128(a), (c)-(d) of the Workers' Compensation Medical Cost Containment Regulations provides, in pertinent part, that:

> (a) Acute care provided in a trauma center or a burn facility is exempt from the medical fee caps, and shall be paid based on 100% of usual and customary charges if the following apply:

> (1) The patient has an immediately life-threatening injury or urgent injury.

**(Footnote continued on next page…)**

Bureau ordered that payment shall be made in accordance with the Workers' Compensation Fee Schedule. (F.F. Nos. 16.a. n.4, 17.a.-c.)

Thereafter, on May 30, 2019, Provider filed a request to contest the Bureau's fee review determination and, pursuant to 34 Pa. Code §127.259 (relating to fee review hearings), the request was assigned to the Hearing Officer. Subsequently,

---

**(continued…)**

> (2) Services are provided in an acute care facility that is one of the following:
>
> (i) A level I or level II trauma center, accredited by the Pennsylvania Trauma Systems Foundation under the Emergency Medical Services Act[, Act of July 3, 1985, P.L. 164, *as amended*, 35 P.S. §§6921-6938].
>
> \* \* \*
>
> (c) If the patient is initially transported to the trauma center or burn facility in accordance with the American College of Surgeons' (ACS) triage guidelines, payment for transportation to the trauma center or burn facility, and payments for the full course of acute care services by all trauma center or burn facility personnel, and all individuals authorized to provide patient care in the trauma center or burn facility, shall be at the provider's usual and customary charge for the treatment and services rendered.
> (d) The determination of whether a patient's initial and presenting condition meets the definition of a life-threatening or urgent injury shall be based upon the information available at the time of the initial assessment of the patient. A decision by ambulance personnel that an injury is life-threatening or urgent shall be presumptive of the reasonableness and necessity of the transport to a trauma center or burn facility, unless there is clear evidence of violation of the ACS triage guidelines.

34 Pa. Code §127.128(a), (c)-(d).

the Hearing Officer held hearings, Provider introduced documentary evidence, and both parties submitted written argument. (F.F. Nos. 18-19.)

At the hearing, Provider presented evidence, including the 2011 ACS Guidelines that are used for deciding whether a patient should be transported to a trauma center and definitions of a "crush injury" in medical dictionaries. (F.F. Nos. 20.a.-e., 21.) Insurer filed its written argument on November 5, 2019, averring, *inter alia*, that Claimant's injury was neither urgent nor life-threatening, and citing *Crozer Chester Medical Center v. Bureau of Workers' Compensation Fee Review Hearing Office* (Pa. Cmwlth., No. 648 C.D. 2018, filed April 3, 2019) (unreported), as support for its position. (F.F. No. 22.a.-c.) Provider filed its written argument on November 26, 2019, asserting, in pertinent part, that Claimant's injuries met the trauma criteria and qualified for an exemption from the medical fee caps in the Workers' Compensation Fee Schedule. (F.F. No. 23.a.-e.)

In her decision, the Hearing Officer stated that the central issue in Provider's appeal was whether the treatment provided to Claimant was for an immediately life-threatening or urgent injury, such that Provider is entitled to reimbursement at 100% of the usual and customary charges and not limited by the medical fee caps. *See* F.F. No. 2; *see also* section 306(f.1)(10) of the WC Act, 77 P.S. §531(10) (prescribing that a provider is entitled to its usual and customary charge for acute care in an acute care facility, accredited as a Level I or Level II trauma center, of a patient with an immediately life-threatening or urgent injury). Based upon the evidence presented, the Hearing Officer found that Claimant sustained a "crush injury" at work on February 5, 2019, and his crush injury met the criteria in the ACS Guidelines for transport to a trauma center. More specifically, the Hearing Officer found that Claimant met steps two and four of the ACS Guidelines,

in that the Guidelines do not require that an additional injury be present to warrant transport to a trauma facility when a crush injury occurs, and the guidelines recommended transport to a trauma center when the patient is over 55 years old. Relying on the plain language of the ACS Guidelines, the Hearing Officer found that Provider's proffered medical definitions of a crush injury were irrelevant and further found that Insurer's reliance on *Crozer Chester* was misplaced and distinguishable, because, unlike the situation in *Crozer Chester*, there was no dispute in this case as to the mechanism of injury and neither Provider nor Insurer submitted expert medical testimony. Ultimately, the Hearing Officer determined that Claimant sustained an immediately life-threatening or urgent injury on February 5, 2019, for purposes of the trauma center exemption under the WC Act. (F.F. No. 24.a.-g.)

The Hearing Officer then noted that, because Provider's application was filed timely, Insurer bore the burden of proving by a preponderance of the evidence that it properly paid Provider $5,135.97 for the dates of healthcare services rendered on February 5 and 6, 2019, rather than the Provider's charge of $50,239.57. The Hearing Officer noted that acute care provided in a trauma center is exempt from the medical fee caps and that an insurer shall pay a provider at 100% of the provider's usual and customary charges if the patient has an immediately life-threatening or urgent injury under the regulations. Because the evidence established that Claimant's injury satisfied this standard under the ACS Guidelines, the Hearing Officer concluded that Insurer did not sustain its burden of proving that it properly reimbursed Provider the $5,135.97 for the treatment and services rendered to Claimant on February 5 and 6, 2019. (Conclusions of Law (COL) Nos. 1-5.)

Accordingly, by order dated December 11, 2019, the Hearing Officer vacated the May 8, 2019 administrative determination of the Bureau and ordered

reimbursement at 100% of Provider's billed amount of $50,239.57, less $5,135.97 Insurer previously paid, plus statutory interest on the unpaid portion of the bill, for the treatment and services rendered to Claimant on February 5 and 6, 2019.

Insurer subsequently petitioned this Court for review.[3]

## Discussion

Before this Court, Insurer basically argues that, as matter of medical and scientific fact, Claimant did not sustain a "crush injury" for purposes of the ACS Guidelines. For support, Insurer quotes a medical definition submitted by Provider at the hearing, which defines a "crush injury" as "[t]rauma to body tissues resulting from an applied force that compresses or squeezes tissues, causing damage such as compartment syndrome, dislocation, fracture, laceration, or nerve damage." (Insurer's Br. at 11.) Insurer then reasons as follows: "Claimant did not have muscle tissue damage, the lacerations were 'superficial,' the x-rays showed no fracture or dislocation, there was no compartment syndrome, Claimant's pulse was 2+, his range of motion was normal, and his strength was 5/5." (Insurer's brief at 4.) Following this course of argument, Insurer continues: "As indicated in the Claimant's discharge summary, Claimant's CPK was within normal limits. When muscle tissue is damaged CPK leaks into the bloodstream. A normal CPK level indicates no muscle tissue damage. Additionally, the medical records are clear that Claimant did not sustain compartment syndrome, dislocation, [or] fracture." (Insurer's Br. at 8.)

---

[3] Our standard of review is limited to determining whether the Hearing Officer's findings are supported by substantial evidence and whether the Hearing Officer erred as a matter of law or violated a party's constitutional rights. *Roman Catholic Diocese of Allentown v. Bureau of Workers' Compensation, Fee Review Hearing Office (Lehigh Valley Health Network)*, 33 A.3d 691, 696 n.5 (Pa. Cmwlth. 2011).

9

Insurer also relies heavily on this Court's unpublished decision in *Crozer Chester*, citing it for persuasive value and proffering the following analogy:

> In the *Crozer Chester* case, the [c]laimant sustained a crush injury and a pelvic fracture when a tractor pushed the [c]laimant to the ground and ran over the [c]laimant's right foot. In determining that the [c]laimant's injury was not a crush injury[,] the Court in *Crozer Chester* noted that the [c]laimant's foot "was not pulseless, crushed, degloved or mangled." In the *Crozer Chester* case, the [c]laimant's right-foot injury showed no evidence of compartment syndrome or neurovascular structural damage. Further, the [c]laimant in *Crozer Chester* had a Glasgow Coma scale of 15, meaning that he was alert and responsive. The Court noted that a Glasgow Coma Scale of less than 14 requires transport to a trauma center under [s]tep [o]ne of the [ACS Guidelines].
>
> Comparing the [c]laimant's injury in the *Crozer Chester* case to the case at hand, [] Claimant's injury in this case was a much less significant injury. For instance, the [c]laimant in *Crozer Chester* sustained a pelvic fracture and his right hand was fractured/dislocated requiring an open reduction and internal fixation, whereas [] Claimant in this case had no fractures or dislocations and did not require any surgery. Just as the [c]laimant in *Crozer Chester*, the Claimant in this case had 2+ pulse in his right upper extremity and his right upper extremity was not degloved or mangled. Rather, Claimant had 5/5 strength in the right upper extremity and full range of motion of his right elbow, wrist and digits. Importantly, the medical records show that Claimant's CPK level was within normal limits, an indicator that Claimant did not suffer damage to muscle tissue. Additionally, Claimant's Glasgow Coma Scale was 15, which is the same as the [c]laimant in *Crozer Chester*.

(Insurer's Br. at 11-12.)

Furthermore, for juxtaposition, Insurer cites *Roman Catholic Diocese of Allentown v. Bureau of Workers' Compensation, Fee Review Hearing Office (Lehigh Valley Health Network)*, 33 A.3d 691 (Pa. Cmwlth. 2011), in which this Court found

10

that the claimant met the requirements of the trauma center exception to the medical fee caps, where x-rays found that the claimant sustained two unstable spinal fractures and was placed in an intensive care unit.

Initially, we note that while payments for medical treatment are usually capped under the WC Act and made in accordance with the scales and rates enumerated in the applicable regulations and the Workers' Compensation Fee Schedule, section 306(f.1)(10) of the WC Act contains what is known as the "trauma center exception." In pertinent part, section 306(f.1)(10) states that "[i]f acute care is provided in an acute care facility to a patient with an immediately life threatening or urgent injury by a Level I or Level II trauma center . . . the amount of payment shall be the usual and customary charge." 77 P.S. §531(10). Relatedly, the regulation at 34 Pa. Code §127.128(c) provides that "[i]f the patient is initially transported to the trauma center in accordance with the [ACS] [G]uidelines, payment for transportation to the trauma center . . . and payments for the full course of acute care services by all trauma center . . . personnel, and all individuals authorized to provide patient care in the trauma center . . . shall be at the provider's usual and customary charge for the treatment and services rendered." 34 Pa. Code §127.128(c).

In workers' compensation cases, matters of credibility and evidentiary weight are within the sole province of the fact-finder. *Pittsburgh Mercy Health Systems v. Bureau of Workers' Compensation, Fee Review Hearing Office (U.S. Steel Corp.)*, 980 A.2d 181, 184-85 (Pa. Cmwlth. 2009). We will not reweigh the evidence or substitute our credibility determinations for those of the hearing officer. *Id.* at 185. Further, it is irrelevant whether the record contains evidence to support findings other than those made by the fact-finder; the critical inquiry is whether there is evidence to support the findings actually made. *See A & J Builders, Inc. v. Workers'*

*Compensation Appeal Board (Verdi)*, 78 A.3d 1233, 1238 (Pa. Cmwlth. 2013). In making such a determination,

> [w]e examine the entire record to see if it contains evidence a reasonable person might find sufficient to support the [] findings. If the record contains such evidence, the findings must be upheld, even though the record may contain conflicting evidence. Additionally, we must view the evidence in the light most favorable to the prevailing party and give it the benefit of all inferences reasonably deduced from the evidence.

*Id.* at 1238-39.

In a fee review proceeding, an employer or its insurer has the burden of proving by a preponderance of the evidence that it properly reimbursed a provider of medical services. 34 Pa. Code §127.259(f); *Roman Catholic Diocese of Allentown*, 33 A.3d at 695. Pursuant to 34 Pa. Code §127.128(d), a decision by EMS personnel that an injury is immediately life-threatening or urgent shall be presumptive of the reasonableness and necessity of the transport to a trauma center unless there is clear evidence of violation of the ACS Guidelines. *Id.*; *see Roman Catholic Diocese of Allentown*, 33 A.3d at 699. Significantly, this same regulation states that "[t]he determination of whether a patient's initial and presenting condition meets the definition of an immediately life-threatening or urgent injury *shall be based on the information available at the time of the initial assessment of the patient*." 34 Pa. Code §127.128(d) (emphasis added). As pertinent to this case, step two of the ACS Guidelines states that an individual should be transported to a trauma center when that individual has a "*crushed*, degloved, mangled, or pulseless *extremity*." (Reproduced Record (R.R.) at 25a) (emphasis added). Also, step four of the ACS Guidelines appear to recommend that, regardless of the nature of the injury sustained,

12

an individual over the age of 55 should be transported to a trauma center due to an increase in the risk of injury and/or death. *See id.*

Here, the Hearing Officer found that Claimant sustained a crush injury to an extremity, *i.e.*, the right arm, and this finding is supported by substantial evidence. When EMS personnel originally assessed Claimant, they observed that Claimant's right hand was "dusky," that is, exhibiting bluish or purplish discoloration, noted that Claimant had a "trauma alert/crush injury," and documented that Claimant sustained a "crush injury of [the] right arm in a conveyer belt at work." (R.R. at 35a.) Under 34 Pa. Code §127.128(d), the decision of the EMS personnel is entitled to a presumption of reasonableness unless Insurer can show a clear violation of the ACS Guidelines. Insurer, however, did not submit any evidence to demonstrate that there was a violation of the ACS Guidelines. To the contrary, the evidence found credible by the Hearing Officer establishes that when Claimant was initially assessed by physicians of the trauma center upon his arrival at the hospital, the physicians identified the injury as a "crush/compression injury," noting, among other things, that Claimant's "[r]ight forearm [was] crushed inwards from posterior to anterior" and that there was "[a]bnormal subcutaneous air along the posterior aspect of the right wrist." (R.R. at 36a.) Claimant was then admitted to the trauma/neuro intensive care unit with a diagnosis of "crush injury, arm, right." (R.R. at 57a.) Subsequent evaluations by other physicians and medical personnel, including a plastic surgeon, confirmed that Claimant sustained a crush injury. (R.R. at 86a, 93a, 98a, 104a, 109a.) Indeed, in the discharge summary contained in Claimant's medical records, it was indicated that his "admission diagnosis" was a "[c]rushing injury of right forearm" and "crush injury arm" and that his "discharge diagnosis" was "crush injury arm, right." (R.R. at 173a.)

13

In light of this record, Insurer's reliance on *Crozer Chester* is misplaced. In that case, the hearing officer found the report and testimony of the insurer's medical expert to be credible and persuasive in establishing, *inter alia*, that the claimant did not sustain a "crush injury" as referenced in step two of the ACS Guidelines. Specifically, the hearing examiner credited the testimony of the insurer's medical expert that the claimant did not sustain a crush injury because "the external exams [of the claimant] did not note any bruising, laceration, or any real evidence that [the claimant's] right-foot injury was the result of a crush," and rejected the provider's evidence to the contrary. *Crozer Chester*, slip op. at 6-10. On appeal, this Court concluded that the hearing officer did not err in determining that the claimant's injury was not immediately life-threatening or urgent for purposes of the trauma center exemption. In doing so, we determined that the hearing officer's decision to reject the testimony of the provider's physician that the claimant sustained a crush injury was supported by substantial competent evidence, *i.e.*, the credible testimony of the insurer's physician that the claimant's foot injury was not a "crush injury" because it "was not pulseless, crushed, degloved, or mangled" and did not show any evidence of compartment syndrome or neurovascular structural damage. *Id.*, slip op. at 18.

In essence, Insurer maintains that Provider's submitted medical definition and *Crozer Chester* necessitate that, in order for there to be a primary diagnosis of "crush injury," there must be a secondary diagnosis that includes a broken, or at least fractured bone in an extremity.

However, in the course of this argument, Insurer fails to recognize the distinguishing feature of *Crozer Chester* in its comparison to the facts of this case. In *Crozer Chester*, the parties offered competing expert medical testimony on the issue

14

of whether the claimant's injury constituted a life-threatening or urgent injury for purposes of the trauma center exemption, and the hearing officer's decision was based upon his credibility assessment pertaining to the medical experts' opinions. Here, on the other hand, neither Insurer nor Provider offered expert medical testimony, and the Hearing Officer recognized as much in her decision. *See* F.F. No. 24.f.II. As there was no expert medical testimony presented in this case, the Hearing Officer found as a fact, based on the evidence that was presented to her, namely Claimant's medical records, that there was no dispute that Claimant sustained a crush injury at work on February 5, 2019, when his arm got stuck in a conveyor belt. (F.F. No. 24.a.) In so determining, the Hearing Officer noted the language of step two of the ACS Guidelines, which recommends transport to a trauma facility where there is a "crushed . . . extremity," and found, based upon that language, that an additional injury, such as a fracture or compartment syndrome, is not required in order to warrant transport to a trauma facility when a crush injury occurs. (F.F. No. 24.b.) In addition, the Hearing Officer found Insurer's reliance on *Crozer Chester* to be misplaced on the basis that there was no factual dispute that Claimant's medical records demonstrated that he sustained a crush injury when his arm got stuck in the conveyor belt and Insurer did not submit any rebutting expert medical testimony explaining why the injury could not be considered a "crush injury." (F.F. No. 24.f.I.-IV.) As such, the Hearing Officer found that Claimant met step two of the ACS Guidelines, in that he sustained a crush injury despite not sustaining any other injury, and further found that Provider's medical definitions were irrelevant on that basis. (F.F. No. 24.b., d.)

Upon review, we discern no error in the Hearing Officer's interpretation and application of the ACS Guidelines or her assessment of our decision in *Crozer*

15

*Chester*. Although there may be debate within the medical community as to whether Claimant's injury was a crush injury, in the absence of a broken or fractured bone, it is not the role of this Court to determine the scientific validity of a medical diagnosis or to support one school of medical opinion and thought over another. If Insurer desired to contest the notations and diagnoses in Claimant's medical records stating that Claimant sustained a crush injury, Insurer could have provided expert testimony to contradict those notations and diagnoses or deposed the treating physicians to challenge the foundation and methodology of their medical opinions. Insurer, however, did not do so, and we reject its suggestion that *Crozer Chester* definitively decided the medical criteria needed to support a sound and medically acceptable diagnosis of a "crush injury." Instead, it is up to a hearing officer, as trier of fact, to determine the credibility and weight of the medical evidence and circumstances of the particular case to determine whether a claimant sustained a crush injury, and where, as here, the hearing officer's finding in that regard is supported by substantial evidence, this Court must accept it irrespective of any evidence to the contrary. Notably, Claimant's medical records demonstrated that he was consistently assessed and diagnosed with a crush injury from the moment the EMS arrived at the scene of the injury and committed an initial evaluation, to Claimant's examinations at both the trauma center and the trauma/neuro intensive care unit, and, finally, in the medical documentation pertaining to his discharge from the hospital. Consequently, we find no merit in the arguments of Insurer insofar as they try to impugn Claimant's diagnosis of a crush injury by highlighting any aspect of Claimant's physical conditions or overall well-being at the time of his discharge. Therefore, applying our well-settled standard of review, this Court concludes that the Hearing Officer did not err in finding that Claimant sustained a crush injury and ordering Insurer to pay

16

Provider its usual and customary charge for the treatment and services rendered to Claimant.

Accordingly, we affirm.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Indemnity Insurance Company of :
North America and Sedgwick Claims :
Management Services, Inc., :
                Petitioners :
                     : No. 1767 C.D. 2019
            v. :
                     :
Bureau of Workers' Compensation, :
Fee Review Hearing Office :
(Lehigh Valley Hospital), :
                Respondent :

## ___ORDER___

AND NOW, this 16th day of October, 2020, the December 11, 2019 final determination of a hearing officer of the Bureau of Workers' Compensation Medical Fee Review Section is hereby affirmed.

                                     _____
                                     PATRICIA A. McCULLOUGH, Judge